**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-2295**

---

GROUP HOME ON GIBSON ISLAND, LLC; ASSISTED LIVING WELL
COMPASSIONATE CARE 2, LLC,

        Plaintiffs – Appellants,

    v.

GIBSON ISLAND CORPORATION,

        Defendant – Appellee.

------------------------------

UNITED STATES OF AMERICA,

        Amicus Supporting Appellant.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Lydia Kay Griggsby, District Judge.  (1:20-cv-00891-LKG)

---

Argued:  March 14, 2025                        Decided:  July 15, 2025

---

Before NIEMEYER, HARRIS, and BERNER, Circuit Judges.

---

Vacated and remanded by published opinion.  Judge Harris wrote the opinion, in which
Judge Niemeyer and Judge Berner joined.

---

**ARGUED:**  Steven M. Klepper, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for
Appellants.  Stacie Eileen Tobin, VENABLE LLP, Baltimore, Maryland, for

Appellee. Teresa Kwong, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Geoffrey H. Genth, Justin A. Redd, KRAMON & GRAHAM, P.A., Baltimore, Maryland; Matthew D. Skipper, Jeffrey A. Kahntroff, SKIPPER LAW, LLC, Crofton, Maryland, for Appellants. Katherine Wright Morrone, VENABLE LLP, Washington, D.C.; Craig D. Roswell, NILES BARTON AND WILMER LLP, Baltimore, Maryland, for Appellee. Kristen Clarke, Assistant Attorney General, Bonnie I. Robin-Vergeer, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Damon Y. Smith, General Counsel, Sasha M. Samberg-Champion, Deputy General Counsel for Enforcement and Fair Housing, Joshua R. Gillerman, Ogo O. Orizu, Office of the General Counsel, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Washington, D.C., for Amicus United States of America.

———————

2

PAMELA HARRIS, Circuit Judge:

For years, the Gibson Island Corporation has opposed the efforts of Craig Lussi to build an assisted living facility on Gibson Island, a waterfront community in Maryland. Litigation ensued, and discovery produced an extensive record dating back years, with the parties hotly disputing material facts and the inferences to be drawn from them. We conclude that a reasonable jury could find that the Corporation violated the federal Fair Housing Act and Maryland state law by refusing to make a reasonable accommodation to its land-use restrictions for Lussi's proposed facility, by retaliating against Lussi for protected activity, and by discriminating on the basis of disability. We therefore vacate the district court's grant of summary judgment to the Corporation.

## I.

This case is the culmination of a long-running dispute between two parties: the Gibson Island Corporation, a homeowners association for a private, gated community on the Chesapeake Bay in Anne Arundel County, Maryland; and Craig Lussi, a long-time Gibson Island homeowner who operates three assisted living group homes for seniors with disabilities in other parts of the County. Although the parties have a longer history, this suit arose in 2020, when Lussi went forward with a plan to open another group home for elderly people with disabilities, this one on Gibson Island. Members of the Gibson Island community immediately expressed their "distress" to the Corporation, J.A. 1779, which responded with what it called a "360 degree" strategy to block the project, J.A. 1792.

3

Part of that strategy was the Corporation's invocation of a restrictive covenant – which we, like the district court, will call the "business-purpose covenant" – prohibiting the use of Gibson Island homes for business purposes without the Corporation's approval. What followed was some complicated legal wrangling and negotiations, detailed below. But in summary, Lussi asked the Corporation to waive the business-purpose covenant as a reasonable accommodation for his proposed assisted living facility, and the Corporation refused to do so unless Lussi agreed to four disputed conditions. Lussi would not agree to what he viewed as unreasonable conditions, negotiations were terminated, and this suit followed.

To give a sense of the long and contentious relationship between Lussi and the Corporation, we begin with some factual background. We turn then to the immediate predicate for this suit, and finally to the district court decision granting summary judgment to the Corporation.

**A.**

1.

The bad feelings between Lussi and the Corporation appear to date back at least to 2016, when Lussi first proposed building an assisted living group home on Gibson Island.[1] The Corporation's then-President responded that "assisted living is a non-starter," J.A.

---

[1] This case comes to us on the Corporation's motion for summary judgment and Lussi's cross-motion for partial summary judgment. We view the facts in the light most favorable to the non-movant with respect to each motion. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). Most of the facts presented here are undisputed, unless otherwise noted.

1456, and that there was "no interest in the assisted living concept" in the Gibson Island community, J.A. 1747.

In 2018, Lussi obtained a permit for a proposed group home for the elderly outside Gibson Island's borders, but just barely. Many Gibson Island residents opposed that project, with some allegedly complaining about the prospect of "[d]irty old people's diapers," and others lamenting a predicted "free for all with cars in and out, trash, diapers, and old people." J.A. 1753. The parties dispute the role of the Corporation in opposing that nearby project, with Lussi alleging that the Corporation solicited complaint letters from community members and helped to orchestrate his expulsion from the Gibson Island Club – a private country and yacht club – in 2019.

When Lussi tried to buy a property directly from the Corporation in 2019, the Corporation rejected his bid, citing the parties' past contentious interactions. According to the Corporation, it could not accept Lussi's offer in light of litigation threats and accusations Lussi had previously leveled against it. Those past "accusations" included claims by Lussi that the Corporation was violating state and federal law by opposing his efforts and by perpetuating discrimination against disabled individuals.

2.

That brings us, finally, to 2020, when Lussi was able to purchase a home on Gibson Island – known as the "Banbury House" – that he planned to use for his assisted living facility. There is no dispute that the Gibson Island community opposed this project, sending the Corporation President what he described as "[o]verwhelmingly negative" messages expressing dismay at this "threat to the Island." J.A. 1657, 1794. What is

5

disputed, and fiercely so, is the reason for this opposition. Some record evidence – emphasized by Lussi – suggests that the community simply did not want elderly, disabled people to live among them and have access to Gibson Island's shared amenities, fearing that the home's residents would change "the nature of [the] community." J.A. 1789. Other evidence – emphasized by the Corporation – indicates opposition to a group home in an area zoned for single-family living. And some opposition appears to have been rooted in a very intense dislike of Lussi himself, who was described in an anonymous letter – displayed publicly on a post-office bulletin board – as a "pathological narcissist[]" and "despicable human being," who has "no respect for other people." J.A. 1791.

Whatever the reason, as news of Lussi's purchase spread, the community was quick to offer the Corporation ideas on how to block the planned renovation of the property. Emails urged a "rapid, strong, multi-disciplinary, legal and extralegal approach" to Lussi's proposed assisted living facility. J.A. 1784. On the legal side, specifically, there were multiple suggestions that the Corporation leverage "regulatory authorities" and licensing and permitting restrictions to impede Lussi's project. One community member, in what would prove to be a prophetic message, suggested that the Corporation question the sufficiency of Banbury House's septic field for use by a group home.

The Corporation was receptive. The Corporation President promised a "360 degree look at how to block [Lussi]" – even though, he explained, the proposed "group home is 'by right' consistent with [the] FHA." J.A. 1792. The Treasurer agreed that the Corporation could "insert [itself] aggressively at every point where public input is required or asked for" as part of a broad strategy to "thwart Lussi's [regulatory] approvals." J.A.

6

1781. And indeed, the Corporation asked Anne Arundel County to revoke Lussi's building permit, alleging, among other deficiencies, that the Banbury House's septic field was inadequate for the contemplated group home. The County denied that request, finding no basis for a revocation. As to the septic system, specifically, the County Health Department verified that it was adequate for the proposed nine-bed assisted living facility.

The Corporation also turned to Gibson Island's business-purpose covenant and to litigation. It sent Lussi a cease-and-desist letter warning him that it viewed his project as a commercial use that could not be pursued without permission under the business-purpose covenant, and directed the community gatehouse to deny entry to Lussi's contractors. When Lussi did not stop construction, it sued in federal district court, seeking a declaratory judgment that Lussi could not proceed without its approval. Lussi promptly counter-sued, alleging that the Corporation's efforts to block his project violated the Fair Housing Act ("FHA"). The district court granted declaratory relief to the Corporation, holding that the business-purpose covenant was enforceable and requiring Lussi to formally request an exemption before proceeding. *Gibson Island Corp. v. Grp. Home on Gibson Island, LLC*, 1:20-cv-842-RDB, 2020 WL 3035232, at *7 (D. Md. June 5, 2020). Until Lussi made such a request, the court said, his FHA claims were premature. *Id.* at *9.

3.

This case entered its final phase in June 2020, when Lussi, as directed, formally sought an exemption from the business-purpose covenant. What he was requesting, Lussi said, was a reasonable accommodation pursuant to federal and state law for his assisted living facility, without which seniors with disabilities could not live on Gibson Island.

It took the "Accommodations Committee," newly appointed by the Corporation, six months to respond with a recommendation. When it did, it adopted a suggestion from the Corporation President – to which he later admitted – that it could block Lussi's project by saying it would be unduly burdensome to work with Lussi. "[E]ntering into an accommodation agreement with [Lussi] would lead to frequent future interactions and disputes with [him], potentially including additional litigation," the Committee advised, "and thus would impose substantial administrative and financial burdens on the Corporation." J.A. 492. To mitigate those burdens, the Committee recommended that the Corporation make any approval of Lussi's exemption contingent on satisfaction of a lengthy list of conditions.

Months of negotiations followed. Eventually, the parties reached agreement on all but four conditions, now at issue in this appeal. One condition – which we will call the "septic condition" – related to the property itself, and would have required Lussi to obtain an annual septic certification and install a special meter to allow for daily septic monitoring. The other three related to the parties' professional relationship: a "dispute-resolution condition," subjecting all disputes to arbitration; an "arbitration-escrow condition," requiring each party to put $100,000 into escrow to cover potential arbitration fees and damages; and a "guarantor condition," requiring business LLCs associated with Lussi's other assisted living facilities to guarantee Lussi's compliance with the parties' agreement. The Corporation refused to approve the group home if Lussi would not agree to these conditions, and Lussi refused to agree. In April 2021, the Board decided it would not negotiate further and withdrew from all discussions.

8

**B.**

Two weeks later, Lussi – formally, two LLCs he had established to finance and manage his proposed facility[2] – filed the operative complaint in this case, alleging that the Corporation had violated the federal Fair Housing Act and Maryland's fair housing laws by refusing to grant a reasonable accommodation for his group home, by retaliating against Lussi's effort to provide such housing, and by discriminating on the basis of disability. The Corporation moved for summary judgment, and Lussi cross-moved for partial summary judgment on his reasonable accommodation claims.

The district court granted summary judgment to the Corporation on all claims. *Grp. Home on Gibson Island, LLC v. Gibson Island Corp.*, No. 20-cv-891-LKG, 2023 WL 8004886, at *18 (D. Md. Nov. 16, 2023). The court began with the reasonable accommodation claims.[3] To prevail, the court explained, Lussi would have to show that his proposed accommodation – an exemption from the business-purpose covenant – was reasonable, and also that it was "necessary" to afford disabled persons "equal opportunity to use and enjoy housing." *Id.* at *10 (internal citation and quotation marks omitted). In finding that Lussi could not satisfy the necessity element, however, the district court analyzed not the proposed exemption itself but instead the four disputed conditions,

---

[2] Lussi used Group Home on Gibson Island, LLC, to finance and purchase the property, and he created Assisted Living Well Compassionate Care 2, LLC, to manage the group home's operations. Those entities were the plaintiffs before the district court on Lussi's claims and are the appellants before us now.

[3] On this and Lussi's other claims, the district court considered the FHA and parallel state-law provisions together, consistent with the parties' briefing.

9

concluding that removal of those conditions was not "necessary" to afford equal housing opportunities. *Id.* at *11–14.

As for Lussi's retaliation and discrimination claims, the district court found that the undisputed facts foreclosed relief as a matter of law. There was no record evidence, the court held, from which it could be inferred that the Corporation opposed Lussi's group home for disabled people because its residents would be disabled, or that the Corporation's efforts to block Lussi's project constituted retaliation for his long-standing efforts to bring an assisted living facility to Gibson Island. *Id.* at *14–17.[4]

The Lussi LLCs timely appealed.

## II.

We review *de novo* a district court's disposition of cross-motions for summary judgment. *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 324 (4th Cir. 2024). We examine each motion separately, viewing the facts and inferences in the light most favorable to the non-moving party. If a reasonable jury could return a verdict for the non-movant, then a genuine factual dispute exists, and summary judgment is improper. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996).

---

[4] The district court also denied Lussi's motion for leave to file a second amended complaint, and it denied as moot both the Corporation's motion in the alternative to strike certain allegations and its motion to file a reply in support. *Group Home*, 2023 WL 8004886, at *17. None of these issues were appealed.

10

In cases where state of mind is decisive – as with Lussi's discrimination and retaliation claims – courts must take "special care" to reserve for a jury the resolution of any genuine dispute about the motivation for a party's actions. *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987). And in all cases, the bottom-line question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

We conclude that the record here is not sufficiently "one-sided" for either party to prevail on summary judgment. We agree with Lussi, as explained below, that the district court committed a legal error in reviewing his reasonable accommodation claim. But once that is cleared away, we are left with a dispute over the "reasonableness" of Lussi's proposed exemption from the business-purpose covenant, and that is a fact-specific inquiry properly resolved by a jury. Specifically, it is for a jury to determine whether, as the Corporation argues, an exemption for Lussi's project would be unduly burdensome and thus "unreasonable" if approved without the four disputed conditions – or whether, as Lussi maintains, those conditions are themselves unreasonable. Unresolved questions about the legitimacy and purpose of the Corporation's conditions also bear directly on Lussi's retaliation and discrimination claims, making those claims, too, unsuitable for summary judgment. Accordingly, we vacate the district court's entry of judgment to Gibson Island Corporation and remand for further proceedings.

11

## A.

We start with Lussi's failure to accommodate claims.  The parties agree on the basics.  Both the Fair Housing Act and Maryland law make it unlawful to "refus[e] to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [an individual with a disability] equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B);[5] *accord* Md. Code, State Gov't § 20-706(b)(4).  This means that communities like Gibson Island cannot enforce their generally applicable housing policies "in a manner that denies people with disabilities access to housing on par with that of those who are not disabled."  *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1104 (3rd Cir. 1996) (internal quotation marks and citation omitted).  Instead, they may be required to make exceptions to accommodate the needs of people with disabilities – including exceptions for group homes that otherwise would be barred by zoning regulations or covenants like Gibson Island's.  *Oconomowoc Residential Prog. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) ("Congress explicitly intended for the FHAA to apply to zoning ordinances and other laws that would restrict the placement of group homes." (citing H.R. Rep. No. 100-711, at 24 (1988))).

Under the FHA, the plaintiff bears the burden of showing that a proposed accommodation is "reasonable" and also "necessary" to afford disabled persons an equal opportunity for housing.  *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 603–

---

[5] The FHA was expanded to include disability discrimination by the Fair Housing Amendments Act of 1988.  *See* Pub. L. No. 100-430, 102 Stat. 1619 (1988).  Like the parties and the district court, we refer throughout simply to the FHA.

12

04 (4th Cir. 1997). An accommodation is "necessary" if there is a "direct linkage" between the proposed accommodation and the provision of equal housing opportunities. *Id.* at 604. An accommodation's "reasonableness" turns on a number of context-specific factors, including the "extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations and the benefits [it] would provide" to individuals with disabilities, whether there are alternatives that would produce the same benefits "more efficiently," and the costs of the accommodation. *Id.*

### 1.

The district court reached only the necessity element, granting summary judgment to the Corporation on Lussi's reasonable accommodation claims because Lussi could not show the required "direct linkage" between his proposed group home and the provision of an equal housing opportunity for people with disabilities. *Group Home*, 2023 WL 8004886, at *11–14. That was so, the district court reasoned, because the evidentiary record established that removal of the four disputed conditions on approval of Lussi's project was not "necessary" to allow for the use of the proposed group home by future residents with disabilities. *Id.* at *11. For instance, the district court found, Lussi's compliance with the proposed septic condition – annual certifications and daily monitoring – would in no way compromise the enjoyment of his property by a disabled resident, making removal of the condition "unnecessary" as a matter of law.

The problem with this analysis is that the district court was asking the wrong question. What matters under the necessity prong is whether a *proposed accommodation* is necessary to provide equal housing opportunities. *See* 42 U.S.C. § 3604(f)(3)(B)

13

(prohibiting the refusal to make reasonable accommodations when "*such accommodations may be necessary to afford* [disabled persons] *equal* [housing] *opportunity*" (emphasis added)). So here, the question is whether the accommodation actually requested by Lussi – an exception to the business-purpose covenant for his proposed group home – was "necessary" to provide prospective residents an equal opportunity to use and enjoy their housing of choice. *See Bryant Woods*, 124 F.3d at 604 (analyzing whether requested accommodation to expand group home was "necessary" in light of other opportunities for disabled persons to live in same area). By asking instead whether removal of the Corporation's proposed *conditions* was "necessary," the district court erred.

This is not just semantics. Under the district court's logic, a community would be free to impose all kinds of burdensome conditions on accommodation approvals even if they have no relationship to the needs of future residents with disabilities, because removing such conditions – say, a condition that a group home's windows be washed daily – would not be "necessary" for enjoyment of the facility by a disabled resident. *See* Brief for the United States as Amicus Curiae at 25. Indeed, the district court found that Lussi was unable to prevail on the "necessary" element precisely *because* the conditions the Corporation sought to impose did nothing to address the needs of potential disabled residents and were not intended to enhance their housing experience. *See, e.g.*, *Group Home*, 2023 WL 8004886, at *14 (explaining that removal of the arbitration-escrow condition requiring Lussi to deposit $100,000 is not "necessary" because the condition "does not supplant the rights of the Banbury [House's] potential disabled residents"). That turns the FHA's "necessity" analysis upside down.

14

When we ask the right question – whether an exemption from Gibson Island's business-purpose covenant is "necessary" to provide Lussi's prospective residents with equal housing opportunity – the record in this case admits of only one answer. The Corporation does not dispute that some elderly individuals with disabilities cannot live in a residential setting without disability-related services and support, like those that would be offered by Lussi's group home. *See Oconomowoc*, 300 F.3d at 787. Nor does the Corporation dispute that it cannot simply offer as an alternative that Lussi and his prospective residents find themselves a different neighborhood to enjoy. *Bryant Woods*, 124 F.3d at 605 (analyzing necessity of accommodation to opportunity to reside in particular area).[6] And, crucially, there is no record evidence even suggesting that elderly, disabled persons who need assistance might be able to find somewhere else on Gibson Island to live. *Cf. Bryant Woods*, 124 F.3d at 605 (finding accommodation to expand size of assisted living facility unnecessary where record established that 30 other group homes with significant vacancies were operating in same county). Instead, as one resident put it, Gibson Island's elderly residents were expected to "move elsewhere, if necessary," so as to "preserve the nature of [the] community." J.A. 1789. Under these circumstances, the necessity inquiry is straightforward: The requested exemption from the business-purpose covenant is "necessary" because without it, Lussi will not be able to operate what would

---

[6] Indeed, before the district court, the Corporation admitted colorfully and with candor that it would be engaging in classic "NIMBYism" if it offered, as an alternative, the prospect of a group home outside Gibson Island.

be the *only* facility that would allow elderly and disabled people an equal opportunity to enjoy the housing of their choice.

2.

That leaves the question of "reasonableness," which the district court did not address.[7] This is the step in the analysis at which the disputed conditions become critical. While it did not move for summary judgment on this point, the Corporation argues it could show at trial that without the four disputed conditions, a Lussi-operated group home would impose an undue burden on the community. Lussi, on the other hand, urges us to find, as a matter of law, that the Corporation's conditions are unnecessary and that his requested accommodation is "reasonable."

Whether a proposed accommodation is "reasonable" is a highly fact- and context-specific inquiry. *See Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272 (4th Cir. 2013). Even in the ordinary case, the "reasonableness" determination involves a weighing of multiple factors: the benefits an accommodation would provide disabled persons, the burdens – including financial and administrative burdens – that would be imposed on a community by non-enforcement of its standard housing policies, and the

---

[7] The Corporation argues that we can skip the reasonableness question because it never actually denied Lussi's accommodation request. We disagree. It is undisputed that the Corporation refused to approve Lussi's accommodation – an exception from the business-purpose covenant – as proposed. Instead, it repeatedly insisted that it would *not* approve that request, and would consider only a *different* exception, one that came encumbered with the disputed conditions. It is hornbook law that a counter-offer is a rejection, not an acceptance, *see* 17A Am. Jur. 2d Contracts § 64, and the Corporation cannot prevail on its argument that it never denied Lussi's accommodation request at all.

16

availability of alternatives that would bring the same benefits as the proposed accommodation more efficiently. *Id.* at 272–73; *Bryant Woods*, 124 F.3d at 604. And in this case, it also requires an assessment of Lussi's claim that the disputed conditions are wholly unnecessary to minimize burdens on the community and render the accommodation request reasonable.

Against this standard and on the evidentiary record before us, we conclude that there are material factual disputes that preclude summary judgment. Take, for instance, the septic condition. The district court found that "the undisputed material facts" showed conclusively that the septic condition addressed the Corporation's genuine "environmental concerns." *Group Home*, 2023 WL 8004886, at *12. We cannot agree. Included in the record is evidence that those seeking to block Lussi's project almost immediately focused on Banbury House's septic system as a way to generate regulatory obstacles. There is testimony from an expert with 40 years of experience with assisted living group homes that he has never heard of a similar daily monitoring requirement. *Id.* at *13 n.4. And there is the undisputed fact that when the Corporation asked the County to withdraw its permit for the Banbury House renovations, the County refused and reaffirmed that the property's septic system was entirely adequate for the proposed nine-bed group house. It is of course possible that the Corporation insisted on annual and daily septic reports in a good-faith effort to address environmental concerns. But it is also possible, we think, that a reasonable jury might find to the contrary, and conclude that the actual purpose of the septic condition was to burden Lussi's project and make it more expensive for him to go forward. That is a question for a jury to resolve.

17

So too with the conditions related to the parties' professional relationship – the dispute-resolution, arbitration-escrow, and guarantor conditions.[8]  The Corporation argues that allowing the group home to go forward without these conditions would be unduly burdensome and costly because of the risk that Lussi will initiate expensive litigation against it in connection with his project.  A reasonable jury could well agree, based on record evidence documenting a long-standing contentious and litigious relationship between the parties.  But at the same time, it is not self-evident, on this record, that the Corporation would be left unduly exposed if it adopted Lussi's requested accommodation as presented – without, say, mandatory arbitration for all claims and a required escrow deposit of $100,000 – or that any litigation-related burden imposed on the Corporation would outweigh the equal-housing benefits provided by Lussi's project.  *See Scoggins*, 718 F.3d at 273.  That, too, is a question appropriately left to a jury.  And given the full course of the parties' dealings, a jury might also question whether these conditions reflect an honest assessment of litigation risk or are part of the Corporation's "360 degree" strategy to "block" the proposed group home.  J.A. 1792; *see also* J.A. 1673–74 (testimony of Corporation President that he may have suggested to the Accommodations Committee that it characterize working with Lussi as unduly burdensome).

---

[8] The United States Department of Justice, amicus curiae in this case, contends that two of the Corporation's conditions related to the parties' professional relationship – the dispute-resolution and arbitration-escrow provisions – are unreasonable because they contradict rights secured by the FHA.  *See* Brief for the United States as Amicus Curiae at 26–27.  Because the parties have not briefed this argument, we will not address it here.

18

Accordingly, as to Lussi's federal and state law reasonable accommodation claims,[9] we agree with the district court that Lussi is not entitled to summary judgment, but hold that the district court erred in granting summary judgment to the Corporation. When it comes to the "reasonableness" of Lussi's proposed accommodation, this case presents a jury question.

**B.**

Lussi's retaliation and discrimination claims also present jury questions. As we have explained, the Corporation's reasons for insisting on the disputed conditions are central to the reasonable accommodation inquiry. But the same questions are also relevant to Lussi's remaining claims, with Lussi alleging that the disputed conditions are nothing more than pretexts for unlawful retaliation and discrimination. We conclude that these overlapping inquiries, too, must be undertaken by a jury.

1.

We begin with retaliation. The FHA makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the FHA. 42

---

[9] Although Maryland fair housing law largely mirrors the FHA, there is a difference with respect to the party that bears the ultimate burden to prove the "reasonableness" of the accommodation. *Compare Bd. of Dir. of Cameron Grove Condo., II v. Maryland Comm'n on Hum. Rels.*, 63 A.3d 1064, 1075 (Md. 2013) (shifting the burden of persuasion to the defendants after the plaintiff proves a prima facie case), *with Bryant Woods*, 124 F.3d at 604 (plaintiff bears the burden of persuasion). That difference does not affect our analysis here, but we note the two different standards that will apply on remand.

19

U.S.C. § 3617.  Maryland law prohibits the same set of retaliatory behaviors.  Md. Code, State Gov't § 20-708; *see also Hall v. Greystar Mgt. Services, L.P.*, 28 F. Supp. 3d 490, 498 (D. Md. 2014).  The parties agree that to prevail, Lussi must show an "adverse action" with a causal link to his advocacy of accommodations for disabled persons, and they agree that an action is sufficiently "adverse" if it could dissuade a reasonable person from the exercise of their rights.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Group Home*, 2023 WL 8004886, at \*16.

The district court held that Lussi had failed to provide any evidence that he suffered an "adverse action."  *Group Home*, 2023 WL 8004886, at \*16.  But the court failed to give due weight, in this part of its analysis, to the adverseness of the actions it recognized elsewhere:  the Corporation's efforts to have the permit for Lussi's project revoked and to otherwise delay the opening of the group home.  And it did not address Lussi's allegation that the Corporation's refusal to grant his accommodation request was *itself* an adverse action, taken in retaliation for his years-long effort to provide equal housing opportunities in or near Gibson Island for elderly people with disabilities.  There is no real dispute that these actions rise to the level of "adverse" under the relevant standard.[10]

Instead, the district court appears to have rested its grant of summary judgment to the Corporation on a finding that Lussi cannot show that these alleged adverse actions were retaliatory in nature, taken in response to Lussi's protected advocacy for the housing rights

---

[10] The Corporation does suggest, in a footnote to its brief, that the Lussi LLCs did not plead this theory of retaliation in their complaint and thus forfeited the issue.  We disagree and find that the issue was adequately presented.

20

of people with disabilities. *Group Home*, 2023 WL 8004886, at *16 ("[T]he evidence simply does not show that the delay in opening [Lussi's] group home is due to retaliation for [Lussi] having engaged in any FHA-protected activity."); *see also id.* (finding the Corporation's effort to have Lussi's permit withdrawn was "legitimately aimed at securing Mr. Lussi's compliance" with the business-purpose covenant). Here again, we disagree with the district court's characterization of the evidentiary record.

Properly viewed in the light most favorable to Lussi as the non-movant, and drawing all reasonable inferences in his favor, we conclude that this record would allow a jury to find that the Corporation sought to block Lussi's latest proposal because of Lussi's advocacy for FHA-protected housing on or near Gibson Island. As we have explained already, a jury could credit, but also could question, the Corporation's stated rationales for refusing to approve Lussi's project without the four disputed conditions. And importantly, the Corporation's own rationale for many of its conditions – that dealing with Lussi is administratively and financially burdensome because of his history of litigation threats and accusations against the Corporation – could be understood as implicating protected activity. To be sure, a jury might vindicate the Corporation's view of Lussi as a bad-faith actor who is so antagonistic and difficult to deal with that these precautionary conditions – the dispute-resolution and arbitration-escrow conditions, for instance – were well justified. But it also could conclude that the Corporation found Lussi so difficult to deal with precisely *because* of his willingness to zealously advocate and litigate for FHA-protected rights. *See, e.g.*, J.A. 1872–75 (Corporation citing Lussi's threats of FHA litigation and allegations of discrimination as reasons for declining to allow him to buy property for

21

proposed group home).[11]  This is a fine line, to be sure, and on this record, we think it is properly drawn by a jury.

We also disagree with the district court that the alleged "numerous acts of personal retaliation" against Lussi and his family – defaming the family by way of signs and letters posted in the neighborhood, for instance, or expelling Mr. Lussi and threatening to expel Mrs. Lussi from the Gibson Island Club – may not be considered as part of the retaliation inquiry.  The district court appears to have dispensed with these allegations on the sole ground that the plaintiffs in this case – the Lussi LLCs – cannot rely on actions taken against Lussi and his family in their personal capacities.  *Group Home*, 2023 WL 8004886, at *16. Neither the district court nor the Corporation has pointed us to authority for this proposition, and we have found none.  Instead, the Supreme Court has deemed it "obvious," in a similar context, that a reasonable person might be dissuaded from engaging in protected activity by a threat to someone closely related.  *See Thompson v. North American Stainless, LP*, 562 U.S. 170, 173 (2011).  The district court erred to the extent it held that conduct targeting Lussi – the sole owner and operator of the plaintiff LLCs – along with his family could not, as a matter of law, constitute "adverse actions" that might dissuade

---

[11] Indeed, some of the statements of Lussi's opponents could be read as themselves characterizing opposition to Lussi and his group home as opposition to the FHA. *See, e.g.*, J.A. 1782 (Corporation President pledging to "do our best to defend deeds and agreement v FHA").

his LLCs from going forward with activity protected by the FHA. Whether that is what happened here, of course, is a different question, and one that should be resolved by a jury.

2.

Finally, we come to Lussi's discrimination claim. The Fair Housing Act prohibits discrimination in the provision of housing based on the disability of the person who resides in or intends to reside in a dwelling. 42 U.S.C § 3604(f)(1)–(2). Maryland law follows the FHA. Md. Code, State Gov't § 20-706(b)(1)–(2); *see also Wallace H. Campbell & Co., Inc. v. Maryland Comm'n on Hum. Rel.*, 33 A.3d 1042, 1052 (Md. Ct. Spec. App. 2011). The parties agree that to prove his claim of intentional discrimination based on disability, Lussi may rely on direct or circumstantial evidence. *See Group Home*, 2023 WL 8004886, at *14–15. Circumstantial evidence includes, as relevant here, evidence that the Corporation's stated rationales for opposing Lussi's project are "unworthy of credence" and pretextual. *See Texas Dep't. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981).

We cannot agree with the district court that there is "no evidence," direct or circumstantial, from which a reasonable jury could find discriminatory intent behind the Corporation's refusal to approve what would be Gibson Island's first and only assisted living facility for disabled people. *See Group Home*, 2023 WL 8004886, at *15. First, as we held in connection with the reasonableness inquiry, while a jury could credit, say, the Corporation's professed environmental concerns about Banbury House's septic system, it also could find that rationale for denying Lussi's requested accommodation to be "unworthy of credence," raising an inference that its true purpose may be discriminatory. *Burdine*, 450 U.S. at 256. There are genuine disputes, described more fully above, as to

23

whether the Corporation sought to impose the contested conditions for its stated nondiscriminatory reasons – sincere concerns about Lussi's combative and litigious attitude and the environmental implications of a group house – or whether they were imposed because the community did not want disabled, elderly people to live among them, as Lussi claims.

Moreover, there is evidence in the record from which a jury could infer that the Corporation and the community harbored hostility to the provision of equal housing rights to disabled persons, or trafficked in stereotypes about the difficulties that would be posed by disabled elderly residents. The Corporation President, for instance, responded to what can only be described as an outpouring of community hostility to Lussi's proposed group home by promising the Corporation would "do [its] best to defend deeds and agreement[s] v FHA," J.A. 1782, "taking a 360 degree look at how to block [Lussi], even if the group home is 'by right' consistent with FHA," J.A. 1792. The district court dismissed those statements entirely, reasoning that the then-President's term was over before negotiations with Lussi concluded. *Group Home*, 2023 WL 8004886, at *15 & n.6. But that overlooks evidence linking the Corporation's early strategizing to the path ultimately followed by the Corporation – including the then-President's admission that he may have been the one to suggest to the Accommodations Committee that it block Lussi's project by claiming that working with Lussi would be unduly burdensome. What weight to give evidence of the then-President's attitude toward the FHA and people with disabilities, we think, is a matter for the jury to decide.

24

As for the community, a jury might infer that at least some vocal members believed that having disabled persons take up residence was simply "inappropriate" for their neighborhood and would disrupt the "nature of [the] community," or that it would be "offensive" if residents of an assisted-living facility had "access to everything on the island[.]" J.A. 1658–59, 1786, 1831. Others – going back to Lussi's earlier efforts to provide a group home for elderly disabled residents – worried about "[d]irty old people's diapers," J.A. 1753, consistent with the later focus on Banbury House's septic system. And there is evidence in the record from which a jury could find that the Corporation acted in response to these community views, so that they may be attributed to the Corporation for these purposes. *See A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 366 (4th Cir. 2008); *see also, e.g.*, J.A. 1781 (Corporation Treasurer suggesting that community opposition could be mobilized against regulatory approvals).

The Corporation argues, and the district court agreed, *see Group Home*, 2023 WL 8004886, at *15, that most of these statements, from the Corporation as well as the community, do not expressly "reference the disabilities of the Banbury [House's] potential residents," *id.*, so that it would "require[] inferences to find any discriminatory motive," Brief of Appellee at 45. But making inferences is what juries are for, and on this record, we think there is evidence from which a reasonable jury could infer a discriminatory motive for the Corporation's refusal to approve Lussi's proposed group home.

\*      \*      \*

We of course express no view as to the proper resolution of this long-running dispute. As we said at the start, while the opposition of the Gibson Island community and

25

Corporation to Lussi's project is clear, the reason for that opposition is not. There is evidence to support the Corporation's position that it sought only to safeguard Gibson Island's sensitive environment and to preserve responsibly its financial and legal interests when faced with a persistent, belligerent, and litigious adversary. And there is evidence to support Lussi's position that the Corporation's stated rationales for conditioning approval of his project on the disputed conditions were pretextual, and that its actual purpose was retaliatory and discriminatory. The only thing we hold today is that on the sprawling record before us, there are two sides to this story, not one, making summary judgment inappropriate. *See Liberty Lobby*, 477 U.S. at 251–52.

Accordingly, we vacate the district court's grant of summary judgment to the Corporation on Lussi's federal and state retaliation and discrimination claims, and remand so that a jury may assess the evidence, draw the appropriate inferences, and bring this matter to a close.

## III.

For the foregoing reasons, we vacate the district court's entry of summary judgment to Gibson Island Corporation and remand for proceedings consistent with this opinion.

*VACATED AND REMANDED*

26